Department of Highways, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued April 18, 1955. Before Rhodes, P. J., Hirt, Ross, Gunther, Wright, Woodside, and Ervin, JJ.

*Joseph J. Laws*, Senior Highway Counsel, with him *John R. Rezzolla Jr.*, Advanced Highway Counsel, *Phil H. Lewis*, Deputy Attorney General, and *Herbert B. Cohen*, Attorney General, for Department of Highways, appellant.

*Harris J. Latta, Jr.*, Assistant Counsel, with him *Albert E. Luttrell* and *John R. Gavin*, Assistant Counsel, and *Thomas M. Kerrigan*, Acting Counsel, for Public Utility Commission, appellee.

*Windsor F. Cousins*, with him *Lawrence K. Connell*, for railroad, intervening appellee.

OPINION BY RHODES, P. J., September 28, 1955:

These appeals are by the Department of Highways of the Commonwealth of Pennsylvania from two orders of the Pennsylvania Public Utility Commission of May 24, 1954 (appeal taken June 25, 1954) and July 12, 1954 (appeal taken August 20, 1954) approving the applications of the department for reconstruction, inter alia, of two railway-highway grade separation facilities, one located in Camp Hill, Cumberland County

(Pa. P. U. C. A-80456), and the other in Falls Township, Bucks County (Pa. P. U. C. A-80351), and allocating the costs thereof. The applications comprehend large highway improvement programs. These appeals relate only to the allocation of costs of the separation facilities.

The applications proposed replacement of existing bridges carrying automobile traffic over the tracks of the Pennsylvania Railroad Company with new and larger structures. Application 80456 involved relocation and reconstruction of a bridge over tracks of the railroad in Camp Hill and adjacent townships in Cumberland County. The existing bridge would be replaced by another structure located to the west of the existing structure. Since the approach to this bridge would be a limited access highway, it was also proposed to construct a supplemental bridge for local service purposes east of the existing structure. The estimated cost of both bridges in this project was $392,924.65.

Application 80351 involved the replacement of an existing bridge with a 4-span deck girder structure with two roadways, each 28 feet in width, carrying state highway route 150 over the existing five tracks of the railroad and over four proposed tracks in Falls Township, Bucks County, a short distance from the site of the new Fairless plant of the United States Steel Company. The estimated cost of the bridge in this project was $690,868.

The department, in the reconstruction of the bridges in both projects, agreed to assume the entirety of certain costs, but requested that the railroad be required to participate in the balance of the cost in each case, consisting of construction costs and the cost of temporary relocation of railroad signal facilities and electrification facilities.

The commission approved both applications by the respective orders from which these appeals have been taken. But it denied the department's requests, and the department was directed to pay the costs of both projects, less the sum of $100,000 agreed to be paid by the railroad and certain substantial fractional costs imposed on the railroad in both projects.

The commission in allocating costs considered the fact that the department proposed to utilize federal funds in connected with the construction of both projects. The commission also took into consideration what it believed to be certain limitations as to cost allocations against railroads as set up in section 5 (b) of the Federal-Aid Highway Act of 1944, December 20, 1944, 78th Congress, 2d Sessions, C. 626, §5, 58 Stat. 838, and General Administrative Memorandum No. 325 of the Public Roads Administration, Federal Works Agency, issued thereunder.

The Federal-Aid Highway Act of 1944 authorizes appropriations of federal funds to States to use in the elimination and reconstruction of grade crossing hazards.[1] This purpose is implemented by section 5 of the act.[2] Section 5 (b) apparently limits the liability

---

[1] The projects are selected by the States, and must meet the requirements and approval of the Federal Government.

[2] "Sec. 5 (a) The Federal share payable on account of any project provided for by the funds made available under the foregoing provisions of this Act shall not exceed 50 per centum of the construction cost thereof other than costs of rights-of-way, and as to costs of rights-of-way shall not exceed one-third of such costs: Provided, That in the case of any State containing unappropriated and unreserved public lands and non-taxable Indian lands, individual and tribal, exceeding 5 per centum of the total area of all lands therein the Federal share shall be increased in each of the three post-war years by a percentage of the remaining cost equal to the percentage that the area of all such lands in such State is of its total area: Provided further, That the entire con-

of a railroad, at least to the United States, where federal funds are used in whole or in part by providing

struction cost of projects for the elimination of hazards of railway-highway crossings, including the separation or protection of grades at crossings, the reconstruction of existing railroad grade crossings, and the relocation of highways to eliminate grade crossings, may be paid from Federal funds, except that not more than 50 per centum of the right-of-way and property damage costs, paid from public funds, on any such project, may be paid from Federal funds: Provided further, That not more than 10 per centum of the sums apportioned to any State under the terms of this Act for each of such post-war fiscal years shall be used for such railway-highway projects, to be expended in accordance with the Federal Highway Act, as amended and supplemented, and the provisions of this section.

"(b) Any railway involved in any project for the elimination of hazards of railway-highway crossings paid for in whole or in part from funds made available under this Act, shall be liable to the United States for a sum bearing the same ratio to the net benefit received by such railway from such project that the Federal funds expended on such project bear to the total cost of such project. For the purposes of this subsection, the net benefit received by a railway from any such project shall be deemed to be the amount by which the reasonable value of the total benefits received by it from such project exceeds the amount paid by it (including the reasonable value of any property rights contributed by it) toward the cost of such project; and in no case shall the total benefits to any railway or railways be deemed to have a reasonable value in excess of 10 per centum of the cost of any such project. The liability of any railway to the United States with respect to any such project may be discharged by paying to the United States, within six months after the completion of such project, such amount as the Commissioner of Public Roads determines to be the amount of such liability. Any such determination of the Commissioner shall be made on the basis of recommendations made to him by the State Highway Department and on the basis of such other information and investigation, if any, as the Commissioner deems necessary or proper. If any such railway has failed so to discharge its liabilities to the United States with respect to any project within six months after the completion thereof, the Commissioner of Public Roads shall request the Attorney General to institute proceedings

·that "in no case shall the total benefits to any railway or railways be deemed to have a reasonable value in excess of 10 per centum of the cost of any such project."

The effect of General Administrative Memorandum No. 325, submitted of record before the commission, is that, in reconstruction projects like those here involved, no benefit shall be considered as resulting to the railroad and no contribution shall be required. The pertinent section of the Memorandum reads as follows: "2. Reconstruction of Existing Railway Highway Grade Separation Structures. This group shall include all projects for the reconstruction, including replacement, widening, or strengthening of existing structures that separate railways and highways at grade, whether on the same or different locations, and shall be considered as not resulting in ascertainable benefits to the railroad and consequently no contribution to the cost of such a project by the railroad shall be required."[3]

---

against such railroad for the recovery of the amount for which it is liable under this subsection. The Attorney General is authorized to bring such proceedings on behalf of the United States in the appropriate district court of the United States, and the United States shall be entitled in such proceedings to recover such sums as it is considered and adjudged by the court that such railway is liable for in the premises. Any amounts paid to or recovered by the United States under this subsection shall be covered into the Treasury as miscellaneous receipts."

[3] The Commissioner of Public Roads made, inter alia, the following determinations under the requirements of section 5 (b) of the Federal-Aid Highway Act of 1944:

"2. That experience under the Act has demonstrated that many of the elements of railway benefits are so vague and difficult of evaluation, are so intangible or speculative and are the subject of such divergence of views on the part of the railroads and the State highway departments that it generally has been and is impossible for them to arrive at a mutually acceptable basis for negotiating the agreement required of them for undertaking individual railway-highway projects. This has resulted in prolonged and futile

The commission also had before it Regulation 1.14, Code of Federal Regulations, Title 23-Highways, §1.14, which provides as follows:

"Railway-highway crossing projects.

"(a) Before a project for the elimination of hazards at a railway-highway crossing shall be approved for construction an agreement shall be entered into between the State highway department and the railroad concerned for the construction and maintenance of such project. Each such project to be financed in whole or in part from funds provided under the Federal-Aid Highway Act of 1944 and subsequent acts shall be classified and the benefits to be derived from and contributions to be made to such project by the railroad shall be determined in accordance with the classification and procedure established for that purpose, and the estimate of benefits and contributions so determined shall be included in the agreement between the State highway department and the railroad.

"(b) State laws pursuant to which contributions are imposed upon railroads for the elimination of hazards at railway-highway crossings shall be held not to apply to Federal-aid projects."

On these appeals the department contends that the commission in allocating costs erred as follows: (1) In considering the source of funds to be used by the department; (2) in arbitrarily making the source of funds the sole basis of its cost allocations; (3) in allocating the costs as to the railroad to conform with the General Administrative Memorandum No. 325.

negotiations in an effort to arrive at a basis of agreement and has defeated the undertaking of many urgently needed projects.

"(3) That for proposed projects as to which no agreement between the State and the railroad has as yet been executed the railway financial liability for determined benefits shall be fixed by classifying the improvement in its proper group as described above."

The commission has broad power to allocate and assess costs in rail-highway crossing improvement or elimination projects. Section 409 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, Art. IV, as amended, 66 PS §1179, provides that no rail-highway crossing heretofore or hereafter constructed shall be altered, relocated, or abolished without order of the commission. Section 411 of the Public Utility Law, 66 PS §1181, further provides: "(a) . . . the expense of such construction, relocation, alteration, protection, or abolition of any crossing, shall be borne and paid, as hereinafter provided, by the public utilities or municipal corporations concerned, or by the Commonwealth, in such proper proportions as the commission may, after due notice and hearing, determine, unless such proportions are mutually agreed upon and paid by the interested parties." See *Pennsylvania Railroad Company v. Pennsylvania Public Utility Commission*, 136 Pa. Superior Ct. 1, 7 A. 2d 86; *Department of Highways v. Pennsylvania Public Utility Commission*, 141 Pa. Superior Ct. 376, 380, 14 A. 2d 611. In apportioning costs the commission is not limited to any fixed rule, but all factors entering into a division of the costs should be taken into consideration and carefully examined. *Pittsburgh, Bessemer & Lake Erie Railroad Co. v. Public Service Commission*, 71 Pa. Superior Ct. 15, 19; *Tarentum Borough v. Pennsylvania Public Utility Commission*, 171 Pa. Superior Ct. 156, 161, 90 A. 2d 853. Such order of the commission as to costs, made in the exercise of its administrative discretion, will not be reversed if reasonable and in conformity with law. *Tarentum Borough v. Pennsylvania Public Utility Commission*, supra, 171 Pa. Superior Ct. 156, 161, 90 A. 2d 853. The present orders, in so far as they relate to allocation of costs, are well within the commission's statutory power. Under the circumstances, in making

allocations, it was proper for the commission to recognize the fact that federal funds were to be used in each of the projects,[4] and to consider the conditions which might be applicable to the use of such funds.

The commission could also consider, in the light of present day conditions, the general purpose and circumstances underlying the grant of federal funds for such projects, including the financial position of the railroads and the relative benefit to the railroads as compared to that accruing to users of motor highways. The two grade separation facilities here involved were relatively small portions of comprehensive improvements involving more than $2,000,000 in each project. Construction of new highways to meet modern traffic conditions is a proper objective, but the railroads are not necessarily real beneficiaries in the construction of such competitive facilities. It appears that the real purpose of the present projects is to replace existing two-lane highways, without regard to their present condition, with a new type of highway construction at new locations. The railroad has little, if anything, to do with the proposed changes. In the Camp Hill project there was testimony that the existing bridge would accommodate an additional railroad track for which provision was likewise made in the new structure. In the Falls Township project the railroad requested that an additional span be included in the bridge structure to provide for future construction of additional tracks, and it was agreeable to pay the cost of the construction of the additional span.

---

[4] The Department of Highways in its brief says: "The Department proposed to and is defraying the costs of the projects out of public monies derived in part from the Pennsylvania Motor License Fund and in part from the State's share of the Federal-Aid Highway Act funds appropriated by Congress in 1952."

It may be that the proposed use of federal funds was the decisive factor in the cost allocations made by the commission. In any event, the allocations were within the commission's general powers, and we cannot say as a matter of law that the commission did not consider all factors, or that it gave undue weight to any one factor in apportioning the costs.

These appeals do not raise the question whether the commission was bound to consider the use of federal funds, nor do they raise the question whether the commission is bound by any alleged restriction where federal funds are used. These are not cases where the commission has refused to consider the use of federal funds or where it allocates costs in violation of alleged restrictions in the use of such funds.

On March 21, 1955, it was stipulated by counsel that these appeals be heard and argued upon an agreed statement of facts including the fact that under dates of August 20, 1954, and November 9, 1954, project agreements were entered into between the Federal Bureau of Public Roads and the Pennsylvania Department of Highways covering the grade separation facilities involved in these appeals, and that in each of the said projects the order of the Pennsylvania Public Utility Commission was accepted as substantially complying with the requirements of the Federal Bureau of Public Roads relative to matters concerning railway-highway separation structures so that no separate State-Railroad agreement was required, and that in both of these instances the projects, so far as the above matters are concerned, were approved as submitted by the State.[5]

---

[5] Section 1.9 of Title 23-Highways, Code of Federal Regulations, provides:

"Project agreements.— (a) A project agreement between the State highway department and the Commissioner shall be executed

These steps were taken by the department in order to secure the use of federal funds, and the "agreements" were entered into after the department had taken the appeals to this Court from the orders of the commission. It would seem that, in view of such acceptance of the commission's orders, the department cannot with good grace question them now. It follows that the questions which the department has attempted to raise on these appeals may have become moot.

The orders of the commission as they relate to the allocation of costs are affirmed.

for each project on a form furnished by the Commissioner. No payment on any project shall be made by the United States unless and until such agreement has been executed, nor on account of costs incurred prior to authorization by the authorized representative of the Commissioner."